**James E. VANN, Petitioner,**

v.

**DISTRICT OF COLUMBIA BOARD OF FUNERAL DIRECTORS AND EMBALMERS, Respondent.**

**No. 83–362.**

District of Columbia Court of Appeals.

Argued Feb. 15, 1984.

Decided July 25, 1984.

Susan H. Sarch, Washington, D.C., with whom Charles Rosenbleet, Washington, D.C., was on the brief, for petitioner.

Lutz Alexander Prager, Asst. Corp. Counsel, Washington, D.C., with whom Inez Smith Reid, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for respondent. Edward E. Schwab, Asst. Corp. Counsel, Washington, D.C., also entered an appearance for respondent.

Before MACK, BELSON, and TERRY, Associate Judges.

TERRY, Associate Judge:

Petitioner seeks reversal of an order of the District of Columbia Board of Funeral Directors and Embalmers (the Board) revoking his undertaker's license. He attacks the Board's decision on four grounds: (1) that the revocation of his license without proof of fault or intent on his part violated his right to due process, (2) that three of the regulations on which the Board relied, 5N DCRR §§ 1.1, 2.1, and 12.1, are unconstitutionally vague, (3) that the Board acted in an arbitrary and capricious manner when it found that he violated D.C.Code § 6–214 (1983 Supp.), and (4) that the Board deprived him of his Fifth Amendment right to due process and his Sixth Amendment right to confrontation when it denied his request to stay the hearing until after the conclusion of a grand jury investigation and refused his request to allow further cross-examination of a witness during the hearing. Although all but one (the third) of petitioner's arguments are without merit, our independent review of the record persuades us that the Board erred in charging and finding that petitioner had violated certain regulations and code sections relating to undertakers. Nevertheless, we are satisfied that the Board would have revoked petitioner's license despite these errors. We therefore "invoke the rule of prejudicial error," D.C.Code § 1–1510(b) (1981), and affirm the Board's decision. *See Arthur v. District of Columbia Nurses' Examining Board,* 459 A.2d 141, 146 (D.C.1983).

I

The facts giving rise to the revocation of petitioner's license are not in dispute. On Wednesday, June 2, 1982, Royster Martin, an employee of petitioner's funeral home who, according to petitioner, was "assigned to handle all contracts [with certain hospitals] for removal and disposal of fetuses—newborn, amputations and contaminated materials," picked up the bodies of two dead babies from Children's Hospital. He was asked by Walter Reed Army Medical Center, however, to delay his regular pickup until Thursday or Friday because the hospital was having an inspection and needed time to complete its accreditation report. On Thursday, June 3, Mr. Martin picked up three stillborn fetuses from Walter Reed. Petitioner admitted, in a letter to the Deputy Chief Medical Examiner, that Mr. Martin "did not follow [the funeral home's] standard procedures" relating to the removal and disposition of human remains; instead, he left the fetuses and the bodies of the two babies overnight inside his van, which was parked on the funeral home's parking lot. He also neglected to take them out and dispose of them properly on Friday.

Then, as petitioner explained to the Deputy Chief Medical Examiner, "apparently someone came by during the night, over the weekend, opened the vehicle and left the door open, after which an animal (dog) got into the vehicle and dragged the fetuses out into a nearby [alley]." When petitioner became aware of what he described as "this unfortunate incident," he fired Mr. Martin and "personally [took] over the supervision of this operation." He wrote letters to the two hospitals to assure them that "this was an isolated incident beyond [his] control, and that it [would] not happen again." Petitioner also requested his counsel to prepare a press release explaining what had happened and stating that "no one associated with the Funeral Home except the employee involved was aware of the deviation from standard operating procedures relating to the Thursday/Friday pick-up and the failure to have the material secured in the refrigerator of the Funeral Home."

Approximately three months later the Board charged petitioner with violations of 5N DCRR §§ 2.1 and 12.1, D.C.

Code § 27–120 (1981),[1] and D.C.Code § 6–214 (1983 Supp.) in connection with the removal, transportation, and disposition of the bodies of two dead infants and a stillborn fetus from Walter Reed Army Medical Center and Children's Hospital.[2] After a hearing, the Board concluded that petitioner had "violated the laws and regulations of the District of Columbia relating to the removal, burial, and disposition of human remains; and engaged in annoying and unseemly conduct" in violation of the cited regulations and statutes. The Board thereupon revoked his license.

This court may set aside a decision by the Board if it finds, *inter alia,* that the decision is "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that it is "[u]nsupported by substantial evidence in the record ...." D.C.Code § 1–1510(a)(3)(A), (E) (1981); *see Vann v. District of Columbia Board of Funeral Directors & Embalmers,* 441 A.2d 246 (D.C. 1982). Although the Board's decision is by no means without flaw, we are satisfied that it is supported by substantial evidence and is otherwise free from prejudicial error.

## II

First, petitioner argues that the Board violated his constitutional right to due process because "without proof of fault or intent on [his] part ... he was held personally responsible for this accident and penalized with the loss of his livelihood." He contends that he "was held responsible for the unknown and unforeseen acts of an employee of the [funeral home] corporation," when culpability should have attached only if it was "proven that [he] either knew or should have known that the driver would one day leave the remains in the station wagon." Finally, he maintains that under this court's decision in *Greene v. Real Estate Commission,* 218 A.2d 508, 511 (D.C. 1966), "[t]he law ... in the District of Columbia is that a penalty or forfeiture cannot be imposed on the master for the acts of an employee, unless the statute imposing the penalty states otherwise." These arguments are all without merit.

In *Greene v. Real Estate Commission, supra,* this court affirmed the ninety-day suspension of a broker's license by the Real Estate Commission, holding that the record demonstrated "culpable fault and omissions" on the part of the broker for the unlawful acts of his unlicensed employee. *Accord, Cardoza v. Real Estate Commission,* 248 A.2d 815, 817 (D.C.1969) ("If a real-estate broker, either knowingly or culpably, permits an employee to act unlawfully in the performance of his duties as a real-estate agent, his license may be revoked or suspended ...."); *see Am-Chi Restaurant, Inc. v. Simonson,* 130 U.S.App.D.C. 37, 38–39, 396 F.2d 686, 687–688 (1968). In *Greene* we quoted with approval the language of the Missouri Court of Appeals in *Davis v. Missouri Real Estate Commission,* 211

---

**1.** Section 27–120 provides in pertinent part:

No [dead] body or part thereof shall be kept in [the District of Columbia] in such manner as to give rise to any offensive odors to the annoyance of any person or persons in the neighborhood or to the public, nor so as to be exposed to the public view....

Other statutes and regulations will be quoted as appropriate in the course of this opinion.

**2.** Petitioner was also charged with violations of 5N DCRR §§ 10.1 and 12.2. It is difficult to understand how the Board could bring charges against anyone under these regulations. Section 10.1 empowers the Board to "refuse to issue or renew an undertaker's license, or suspend or revoke the license of any undertaker or appren-tice undertaker...." Section 12.2 simply provides that "[e]ach licensee shall be responsible for the conduct of his employees, agents, servants, or other persons acting at the licensee's instance, bidding, control or direction, insofar as such conduct relates to the performance of undertaking services by or for the licensee." Because of the way these two regulations are worded, neither of them can be used by the Board as the basis of separate substantive charges against a licensee, nor can it be said that petitioner "violated" them. The Board's findings and conclusions with regard to these particular regulations are therefore a nullity and must be vacated.

S.W.2d 737 (Mo.App.1948), in which that court said, in reversing the suspension of a broker's license for the unlawful act of his employee:

> The rule of respondeat superior, under which civil liability upon the master for the acts of an employee is imposed, is not applicable when it comes to the imposition of a penalty or forfeiture. *Unless the statute imposing the penalty expresses a contrary intent,* an employer will be held liable in such cases only in case of some culpable fault or omission on his part.

*Id.* at 740 (citation omitted; emphasis added). We are satisfied that the acts committed by petitioner's employee in this case amounted to "culpable fault or omission" attributable to petitioner and authorized the Board to revoke his license. Moreover, by allowing an unlicensed person to perform the duties of a licensed undertaker, petitioner himself was guilty of "culpable fault." *Greene v. Real Estate Commission, supra; Biggs v. Department of Registration & Education,* 70 Ill.App.3d 874, 27 Ill.Dec. 136, 388 N.E.2d 1099 (1979); *Lawless v. Louisiana State Board of Embalmers & Funeral Directors,* 433 So.2d 416 (La.Ct.App.1983); *see* 5N DCRR § 2.1.

■ The regulations involved in this case, unlike the statutes in *Greene, Cardoza, Am-Chi Restaurant,* and *Davis,* specifically express a "contrary intent" so as to expand the potential scope of petitioner's liability.[3] 5N DCRR § 12.2 provides:

> Each licensee *shall be responsible* for the conduct of his employees, agents, servants, or other persons acting at the licensee's instance, bidding, control or direction, insofar as such conduct relates to the performance of undertaking services by or for the licensee. [Emphasis added.]

This regulation codifies the rule of *respondeat superior,* making a licensee liable for the acts of his employees committed during the course of their employment. In the context of the licensing scheme, this means that the licensee may have his license suspended or revoked on account of an employee's conduct. *See Daggett v. State Board of Funeral Directors & Embalmers,* 44 Cal.App.2d 742, 746–47, 112 P.2d 956, 958 (1941); *Biggs v. Department of Registration & Education, supra; Lawless v. Louisiana State Board of Embalmers & Funeral Directors, supra. See generally Camacho v. Youde,* 95 Cal.App.3d 161, 157 Cal.Rptr. 26 (1979). To accept appellant's argument that because he did not know of his employee's conduct, he should not be held accountable, would completely undermine the *respondeat superior* principles upon which section 12.2 is based.

■ Finally, petitioner argues that the revocation of his license on account of his employee's negligence violated his right to due process. The primary purpose of the statutes and regulations governing the activities of undertakers is to protect the general public. Similarly, the purpose of the administrative proceeding which resulted in the revocation of petitioner's license was not to punish petitioner, but "to determine whether [petitioner had] exercised his privilege in derogation of the public interest." *Camacho v. Youde, supra,* 95 Cal. App.3d at 164, 157 Cal.Rptr. at 28. The regulation holding petitioner accountable

---

**3.** The *Davis* case speaks in terms of a statute expressing a "contrary intent," and the *Greene* and *Cardoza* cases, in which this court followed *Davis,* both involved violations of licensing statutes; the instant case, however, involves both statutes and regulations. This disparity is a matter of no consequence. Because D.C.Code § 47–2843(d)(1) (1981) authorizes the Board to revoke or suspend the license of any undertaker "for violation of the laws and regulations of the District of Columbia relating to the removal or burial or disposal of dead human bodies," we hold that the rule announced in *Davis* applies whenever a penalty is based on a violation of either a statute or a regulation. In other words, if either a statute or a regulation "expresses a contrary intent," *i.e.,* an intent to impose "a penalty or forfeiture" on an employer for the acts or omissions of an employee, *Davis* permits the employer to be held accountable under the doctrine of *respondeat superior* even without any separate "culpable fault or omission" on his part.

for the acts of his employee, 5N DCRR § 12.2, is reasonably designed to protect the public interest, and it cannot be said on this record that the Board applied it to petitioner in an arbitrary or discriminatory manner. Therefore, since both the regulation and the hearing had a rational public purpose, we hold that the requirements of due process were satisfied. *See West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 391, 57 S.Ct. 578, 581, 81 L.Ed. 703 (1937) ("regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process"); *Nebbia v. New York*, 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934).[4]

### III

Petitioner next contends that 5N DCRR §§ 1.1, 2.1, and 12.1 are unconstitutionally vague and that the Board erred when it revoked his license on the ground that he had violated these regulations. While petitioner's constitutional attacks on these regulations are meritless, it appears that the Board erred in revoking petitioner's license on the ground that he violated section 12.1 because, on the facts of this case, that section did not apply.

When a law or statute is challenged on the ground that it is overbroad and vague, "a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not ... the overbreadth challenge must fail. The court should then examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all

of its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–495, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982) (footnote omitted). The Supreme Court has held that a vague statute is one that regulates conduct in such a fashion "that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application ...." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926) (citations omitted); *accord, e.g., Grayned v. City of Rockford*, 408 U.S. 104, 108–109, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222 (1972). In analyzing a vagueness challenge, "statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975) (citation omitted); *accord, In re B.K.*, 429 A.2d 1331, 1334 (D.C.1981). Furthermore, a greater tolerance for imprecision is afforded to statutes that deal with economic regulation and civil penalties. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., supra*, 455 U.S. at 498–499, 102 S.Ct. at 1193. The regulations in question here pass the vagueness test.

5N DCRR § 2.1 provides: "No person shall permit any person in his employ to perform, discharge or engage in any of the duties of an undertaker ... unless the individual performing such duties has been licensed ...." 5N DCRR § 1.1 defines the duties of an undertaker as "those services directly affecting the care, preparation and movement of dead bodies for burial or cremation." We hold that these two regula-

---

**4.** The Board's charge that petitioner had permitted Mr. Martin to remove and transport the bodies of two babies from Children's Hospital, in violation of 5N DCRR § 2.1, was not in any way related to Mr. Martin's subsequent negligent behavior. 5N DCRR § 2.1 provides in pertinent part: "No person shall permit any person in his employ to perform, discharge or engage in any of the duties of an undertaker ... within the District, unless the individual performing such duties has been licensed...." 5N DCRR

§ 1.1 provides in pertinent part: "The duties of an undertaker ... shall be interpreted to mean those services directly affecting the care, preparation *and movement* of dead bodies for burial or cremation" (emphasis added). Despite this prohibition, petitioner acknowledged in his letter to the Deputy Chief Medical Examiner that Mr. Martin, who did not possess a license, was "assigned to handle all contracts for removal and disposal...."

tions, read together, would put a licensed undertaker of "common intelligence" on notice that he would break the law if he delegated the duty of transporting dead bodies to an unlicensed employee. This is exactly what petitioner assigned Mr. Martin, his unlicensed employee, to do.

On August 2, 1982, petitioner's counsel wrote to the Board asking for guidance as to "who within the funeral home establishment [could] do what, and under what level of supervision." Specifically, petitioner sought clarification as to the "present practice [of retrieval of dead bodies by] ... apprentice undertakers without licensed undertakers being physically present, and, on occasion, non-licensed support staff ...." The Board responded by letter on September 22 stating, "Bodies must be picked up *only* by a licensed undertaker or a licensed apprentice undertaker under the direct supervision of a licensed undertaker" (emphasis in original). On the same date, petitioner was charged with violating several statutes and regulations, among them 5N DCRR § 2.1, by permitting Mr. Martin to remove the bodies of two dead babies from Children's Hospital. Petitioner now argues that he had no prior notice that his conduct violated this regulation because he was charged with violating it on the same day the alleged clarification was issued. The short answer to this argument is that the regulation was published on September 21, 1970, and did not need clarification. Petitioner was therefore on notice of its provisions for twelve years before the charges were filed against him.

5N. DCRR § 12.1 provides that "[l]icensed undertakers ... their employees, agents, servants, or other persons acting at their instance, bidding, control, or direction, shall not engage in annoying or unseemly conduct in connection with performing, or offering to perform, any undertaking service." The regulation then goes on to provide a non-exhaustive list of acts deemed to be annoying or unseemly.[5] Respondent argues that "[i]t does not stretch the imagination to consider [petitioner's] wholesale and grisly violations of specific statutes and regulations to amount to 'annoying and unseemly conduct' by an undertaker." This argument is unpersuasive. The term "annoying and unseemly conduct" is vague on its face, and we decline to apply it, as respondent asks us to do, to any conduct which results in the violation of any statute or regulation governing the practices of undertakers. In the context of the regulation in which it is found, the term "annoying or unseemly conduct" refers to conduct by an undertaker or his agents or employees designed to solicit or procure business. Applying well-established rules of statutory construction, specifically the doctrine of *ejusdem generis*, we hold that the general term "annoying or unseemly conduct," as used in 5N DCRR § 12.1, refers only to conduct designed to solicit or procure business, such as the types of activities listed in subsections (a) through (d) of the regulation. 2A SUTHERLAND, STATUTORY CONSTRUCTION §§ 47.17–47.18 (4th ed. 1973); *see Moore v. Vincent*, 174 Okla. 339, 50 P.2d 388 (1935). *See also Vann v. District of Columbia Board of Funeral Directors & Embalmers, supra,* 441 A.2d at 251–252. Thus, while section 12.1 is not

---

5. Specifically, 5N DCRR § 12.1 characterizes the following as annoying or unseemingly conduct:

    (a) Loitering by the licensee or any employee of the licensee, or any person acting on behalf of the licensee, in or about a hospital, sanitarium, or other place containing a dead or dying individual, for the purpose of soliciting the employment of the licensee's services.

    (b) Offering or giving any gratuity or payment, either in money or property, to any hospital, sanitarium, or morgue employee for information concerning any dead or dying individual.

    (c) Requesting the representative of the deceased to change undertakers.

    (d) Engaging in a dispute with another undertaker or his employee for the possession of a body. In this connection, whenever any undertakers have differences of opinion concerning their legal right to take possession of a body, they shall refer the matter to the chairman of the Committee for a decision....

void for vagueness, it does not apply to this case. Accordingly, that portion of the Board's order revoking petitioner's license on the ground that he violated 5N DCRR § 12.1 is vacated.

IV

Petitioner further contends that the Board's finding that he violated D.C.Code § 6–214 (1983 Supp.) was arbitrary and capricious. Although the arguments advanced by petitioner in support of his contention miss the mark,[6] the plain language of the statute and its application to the facts of this case show that the Board could not have validly charged petitioner with violating section 6–214, much less found that he violated it.

D.C.Code § 6–214 (1983 Supp.) provides in pertinent part:

> (a) The funeral director ... who first assumes custody of a dead body, before he or she may dispose of the body, must have: (1) Authorization for final disposition of the body from the next of kin; and (2) a death certificate. If the body is to be cremated, authorization for cremation must also be obtained from the Medical Examiner.
>
> (b) Before final disposition of a dead fetus ... the funeral director ... or other person responsible for final disposition of the fetus, shall get authorization from the next of kin for final disposition.

Thus, under section 6–214, a licensed undertaker must obtain (1) authorization from the next of kin and (2) a death certificate before he may dispose of a dead body. Furthermore, if cremation is the contemplated method of disposal, he must have authorization from the Medical Examiner. Before disposing of a dead fetus, however, all he needs is authorization from the next of kin.

■■■ The record contains written authorizations from the next of kin regarding the disposal of the bodies of the two dead babies, as well as their death certificates. There is authorization from the Medical Examiner for the cremation of one of the babies. With respect to the stillborn fetus, the record contains a form authorizing its disposal, bearing the signature of its next of kin. Thus, even assuming *arguendo* that the conduct of petitioner's employee brought about a disposal, section 6–214 was not violated. There was no need to procure authorization for cremation since the bodies were not cremated. All the other necessary documents were prepared. In short, petitioner did not violate this statute, and the Board's finding that he did is erroneous.

■■■ The Board also found that petitioner had violated D.C.Code § 27–119 (1981), which provides in pertinent part:

> It shall be unlawful to ... dispose of the dead body ... of any human being, except upon a permit, duly issued by the Director of the Department of Human Services of the District of Columbia ... or to remove from place to place, or transport, the dead body, or any part

---

**6.** Referring to findings by the Board that he failed to procure and file certain authorization permits before he disposed of the bodies of the two dead babies and one stillborn fetus, petitioner argues that the Board "placed requirements within Section 6–214 which were not in the statute." Specifically, petitioner argues that "[s]ince [he] never had an opportunity to make final disposition of these infant remains because of the accident and the subsequent turning over of the remains to the Medical Examiner, it is simply irrelevant when or if these authorization permits were filed." The obvious answer to this contention is that section 6–214 does not contain any filing requirements except in subsection (f), which has no bearing on this case.

Those portions of the remainder applicable to funeral directors merely require that certain documents be *obtained* by a licensee before the disposal of a dead body or fetus. Apparently, respondent has also neglected to read the statute, for it purports to concede in a footnote in its brief that "[petitioner's] failure to file papers required by the District for deaths and disposal of bodies may not have been a violation of [section 6–214] because there [was] no evidence that [the funeral home] had made a 'final disposition' of the bodies." We reject this concession as irrelevant. Section 6–214 simply is not violated by a failure to *file* any paper before disposal of a body.

thereof, of a human being, except upon such terms and conditions as the Mayor may specify .... [7]

Petitioner was not charged, however, with violating this section; thus we set aside the Board's finding as to this violation. *See* 5DD DCRR § 20.2(b)(1).

## V

█ Petitioner's final contention is that the Board deprived him of his Fifth Amendment right to due process and his Sixth Amendment right to confrontation. Specifically, he argues that the Board violated his rights when it denied his request to stay the hearing until an ongoing grand jury investigation, apparently focusing on funeral home practices, was completed and when it refused his request to allow further cross-examination of a Metropolitan Police detective during the hearing. On the present record, petitioner's arguments are without merit.

During the cross-examination of Detective James Slawson, who testified about the discovery of the bodies in the alley, the following exchange took place:

Q. Did you do any follow-up investigation with regards to the hospitals that were involved?

A. Yes, I did.

Q. Did you—were you able to determine the nature of the relationship between the funeral home and the hospitals?

A. All of that investigation has been carried on under the auspices of the Grand Jury in the District of Columbia and as a result all the material has been gotten by Grand Jury subpoenas and I am not able to testify about that now, sir.

Q. Can I just clarify—your inability to testify is because it is pending before the Grand Jury?

A. And the material seized and the interviews conducted have been under Grand Jury subpoena and as you know that's secret, sir.

On the basis of this colloquy and of the grand jury investigation simultaneously taking place at the time of the license revocation hearing, petitioner raises some interesting arguments, which might carry some force if the revocation of his license were in any way dependent on the relationship between his funeral home and the hospitals. It is not, however, and thus his arguments are irrelevant. The facts giving rise to the charges which caused petitioner's license to be revoked were gathered from petitioner's own statements explaining, as he put it, "this unfortunate incident ...." Petitioner has never challenged or repudiated the admissions contained in the letters he wrote to the hospitals and the Medical Examiner concerning the negligence of his employee. Indeed, petitioner's main argument on appeal, as stated in his brief, is that he has been "held personally responsible for the unknown and unforeseen acts of an *employee* ..." (emphasis added). Given petitioner's admission of the facts supporting the charges which led to the revocation of his license, the Board's decision to proceed with the hearing did not violate either petitioner's Fifth Amendment right to due process of law or his Sixth Amendment right to confront the witnesses against him.

## VI

The Board is empowered to revoke or suspend the license of any undertaker "for violation of the laws and regulations of the District of Columbia relating to the removal or burial or disposal of dead human bodies ...." D.C.Code § 47–2843(d)(1) (1981); *see* 5N DCRR § 10.1. The Board's conclusion that petitioner violated D.C.Code § 27–120 (1981) and 5N DCRR § 2.1 was not arbitrary or capricious and finds sub-

---

**7.** According to the testimony of a supervisory employee of the Vital Records Branch, a disposal certificate is issued to a licensed undertaker after he has complied with the requirements of section 6–214.

stantial support in the evidence.[8]  D.C.Code §§ 1–1510(a)(3)(A), (E) (1981).  These violations provided the Board with ample grounds for revocation of petitioner's license.  The Board's findings and conclusions that petitioner violated 5N DCRR §§ 10.1, 12.1, and 12.2, D.C.Code § 6–214 (1983 Supp.), and D.C.Code § 27–119 (1981), however, cannot be sustained.  Two of the regulations, 5N DCRR §§ 10.1 and 12.2, are written in such a way that they cannot be "violated."[9]  The third regulation, 5N DCRR § 12.1, as we have construed it, does not apply to this case.  There was no evidence of a violation of D.C.Code § 6–214, and petitioner was not even charged with a violation of D.C.Code § 27–119.

  We are troubled by the Board's lackadaisical interpretation of the regulations and statutes it is empowered to enforce, as evidenced by the unfounded charges brought against petitioner in this case.  Nevertheless, we are fully satisfied that the Board would have reached the same result—revocation of petitioner's license—even without committing the errors which this record reveals.  In other words, we hold that none of the Board's several errors were separately prejudicial, nor were they prejudicial in combination.  *See Arthur v. District of Columbia Nurses' Examining Board, supra,* 459 A.2d at 146.

Nothing in *SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), requires a different result.  The Supreme Court held in *Chenery* that "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained."  *Id.* at 95, 63 S.Ct. at 462.  In this case the Board based its revocation of petitioner's license on its findings that he violated several statutes and regulations.  Although we have concluded that some of those findings were erroneous for various reasons, we have also held that some of them were not, and that the findings which are free from error provide ample support for the Board's decision.  In other words, "its action can be sustained" solely by reference to "the grounds upon which the agency acted," and the fact that some of those grounds may have been inadequate is immaterial when the remaining grounds provide a legally sufficient basis for what the agency did.

The findings and conclusions of the Board with respect to 5N DCRR §§ 10.1, 12.1, and 12.2, D.C.Code § 6–214 (1983 Supp.), and D.C.Code § 27–119 (1981) are vacated for the reasons stated in this opinion, but, there being no prejudicial error, the decision of the Board revoking petitioner's license is

*Affirmed.*

---

**8.**  The conduct of Mr. Martin, which resulted in the removal of the bodies from the van and their exposure to public view in the alley, was sufficient to violate D.C.Code § 27–120.  That conduct was chargeable to petitioner under 5N DCRR § 12.2.

With respect to 5N DCRR § 2.1, see note 4, *supra.*

**9.**  5N DCRR § 12.2, however, does embody the legal principle of *respondeat superior,* which is critical to this case.  Even though section 12.2 itself cannot be violated, it can and does make petitioner responsible for violations of other statutes and regulations by his employees.